Arvid **MARTIN**, Respondent,

v.

**ITASCA COUNTY,** Appellant.

No. C2-88-1720.

Supreme Court of Minnesota.

Dec. 1, 1989.

Hugh A. Cameron, County Atty., Michael J. Haig, Asst. County Atty., Grand Rapids, for appellant.

Don L. Bye, Eric D. Hylden, Halverson, Watters, Bye, Downs & Maki, Duluth, for respondent.

COYNE, Justice.

On the petition of Itasca County we review a decision of the court of appeals reversing summary judgment in its favor. By majority decision, the court of appeals held in an unpublished decision that the county's personnel policy, which required placement of any county employee on unpaid leave of absence during the employee's campaign for elective office, did not meet constitutional standards of procedural due process. We reverse and reinstate the judgment of the district court.

In 1981 Arvid Martin was appointed director of the Itasca County Civil Defense Department. As director, Martin holds the highest position in the department and is supervised directly by the Itasca County Board of Commissioners, which appointed him. The director's position is tenured and Martin cannot be discharged without "just cause."

In May 1984, after Martin publicly announced his candidacy for the Itasca County Board of Commissioners, the county attorney advised the board that it could establish a personnel policy which would force Martin or any other appointed county employee, to take an unpaid leave of absence during a campaign for elective office. In June 1984, after a short discussion at a public meeting, the board of commissioners adopted the following personnel policy:

> That appointed county employees declaring candidacy for partisan public office or non-partisan public office for the positions of County Commissioner, County Attorney, County Auditor, County Recorder, County Sheriff, County Treasurer or for State and/or Federal positions shall take a mandatory leave of absence without pay, to commence upon the date of filing for candidacy and to terminate upon the time it has been determined that the employee is no longer a candidate.

Martin subsequently sent a memorandum to the members of the board notifying them of his candidacy and requesting leave of absence. Martin began his leave without pay July 17, 1984, the day after he filed for candidacy. During this leave of absence, Martin lost his wages, seniority rights and fringe benefits, all of which he seeks in this lawsuit. Martin lost the election.

In July of 1986, on the heels of the decision in *AFSCME Council 65 v. Blue*

*Earth County*, 389 N.W.2d 244, 251 (Minn. App.1986), *pet. for rev. denied* (Minn., Aug. 20, 1986), in which a similar personnel policy was declared unconstitutional, the Itasca County Board of Commissioners amended its personnel policy to provide for a hearing before placing an employee on an unpaid leave of absence. Shortly thereafter Martin commenced this action based on the fourteenth amendment of the United States Constitution: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

The United States Supreme Court has enunciated a two-pronged analysis to be used in a procedural due process challenge. The first prong depends on a determination that the state deprived the plaintiff of "life, liberty, or property." The second prong requires the court to decide what process is due, a decision which requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (citation omitted).

■ Before Martin has a right to due process, there must be a property interest at stake. A property interest deserving of constitutional procedural protection has been defined as a "legitimate claim of entitlement" and has been distinguished from a mere "expectation." *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). Roth was a state university professor without tenure who challenged the university's refusal to rehire him for the following year. The United States Supreme Court held that Roth did not have a "legitimate claim of entitlement" to continued government employment because he was not tenured. *Id.*

Martin, unlike Roth, is "tenured" and may not be discharged without just cause. *See also Perry v. Sindermann*, 408 U.S. 593, 602–03, 92 S.Ct. 2694, 2700–01, 33 L.Ed.2d 570 (1972) (professor with de facto tenure had legitimate claim of entitlement to government employment). For this reason, Martin has a legitimate claim of entitlement to his government employment that is protected under the procedural due process clause of the constitution.

■ More, however, is required to complete the first prong of the analysis. The federal constitution mandates procedural safeguards only when the plaintiff is being "deprived" of a property interest. Martin was not permanently deprived of his position, but he was placed on a temporary unpaid leave of absence for almost four months. He seems to have had no other ready livelihood, and he lost approximately $9,000 in salary, as well as various fringe benefits. An overview of decisions of the United States Supreme Court indicates that there is a direct correlation between the length of a temporary suspension of a property interest and the likelihood of a deprivation which invokes the protection of the procedural due process clause. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 261, 90 S.Ct. 1011, 1016, 25 L.Ed.2d 287 (1970) (public assistance); *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 341–42, 89 S.Ct. 1820, 1822–23, 23 L.Ed.2d 349 (1969) (wage garnishment). We hold that Martin's leave of absence, even though only temporary, subjected him to a financial loss of a magnitude sufficient to constitute a deprivation of a property interest which invokes the procedural protection afforded by the fourteenth amendment to the United States Constitution.

■ We next consider the three component factors of the second prong of the *Mathews v. Eldridge* analysis—the extent of the process due a tenured, appointed Itasca County employee who decides to run for elective office. First, because his livelihood is at stake, there can be no doubt of the importance of Martin's private interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543, 105 S.Ct. 1487, 1493, 84

L.Ed.2d 494 (1985). Martin's important private interest in employment is, however, adequately protected by the procedures adopted by Itasca County to determine the relevant facts—a simple determination by the board of commissioners based on the recorded facts that Martin is an appointed county employee who has filed for candidacy to elective office. It is highly unlikely that that procedure will result in an erroneous determination, but had Martin disputed the correctness of the determination that he was a candidate for elective office, the grievance procedures described in the personnel manual were available to him. In fact, of course, Martin acknowledged that he had filed as a candidate for the office of county commissioner in his request for leave of absence pursuant to the county policy.

The third factor, the government's interest, is reflected in policies established at every level of government. The personnel policy adopted by the Itasca County Board of Commissioners is similar to the Hatch Act, 5 U.S.C. § 7324 (1982), which broadly prohibits federal employees from any political activity. In addition, every state, including Minnesota, has enacted a "mini-Hatch Act" which prohibits political activity by state employees. *Broadrick v. Oklahoma,* 413 U.S. 601, 604-05 n. 2, 93 S.Ct. 2908, 2912 n. 2, 37 L.Ed.2d 830 (1973) (annotation of statutes); Minn.Stat. § 43A.32 (1988). The constitutionality of these prohibitions of political activity by government workers has been upheld in the face of a first amendment challenge, *United Pub. Workers of Am. v. Mitchell,* 330 U.S. 75, 103, 67 S.Ct. 556, 571, 91 L.Ed. 754 (1947), an equal protection challenge, *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982), and a substantive due process challenge, *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 580, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973).

In those decisions, the United States Supreme Court recognized that our history as a democratic nation demonstrates that broadly prohibiting political activity by government employees is necessary to ensure that civil servants serve the public and not a political party. A legislative body may prohibit a government employee from becoming a candidate for elective office not only to prevent potential conflict in the workplace between the employee and the supervisor-incumbent during the campaign, but also to prevent any tacit coercion of fellow employees and subordinates to assist in a political campaign. This policy promotes efficiency and integrity in government ranks and also prevents both "danger to the service in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections." *Mitchell,* 330 U.S. at 98, 67 S.Ct. at 569 (footnote omitted).

For these reasons, it is constitutionally permissible to suspend, or even discharge, a government employee who seeks elective office. *See id.* at 103, 67 S.Ct. at 571; *cf. Bolin v. Department of Pub. Safety,* 313 N.W.2d 381 (Minn.1981). The "requirements of orderly management of administrative personnel" outweigh the limited infringements on the first amendment rights of governmental employees to participate in political activity as long as the prohibition does not infringe on the employees' access to the ballot box. *Mitchell,* 330 U.S. at 94, 99, 67 S.Ct. at 566, 569.

Although Martin does not challenge the government's power to regulate its employee's political activity, disagreement with Itasca County's policy underlies Martin's contention that procedural due process requires (a) both notice of the charges and of the evidence the employer intends to present and (b) a hearing before placement on leave of absence to determine the applicability of the personnel policy in the circumstances of the particular case. Martin proposes a "minimal hearing" at which both candidates—the employee and the incumbent—could testify to possible conflicts in the workplace. As a practical matter, it would be nearly impossible to demonstrate that a campaign begun in civility will become acrimonious, so that it interferes with the working relationship between the incumbent supervisor and the employee. As a constitutional matter, it is unnecessary

for the county to justify its policy by demonstrating actual conflict, for the United States Supreme Court has recognized the government's right to prohibit employee participation in political activity without regard to the existence of conflict. *See, e.g., Broadrick,* 413 U.S. at 616–18, 93 S.Ct. at 2918–20; *Mitchell,* 330 U.S. at 102, 67 S.Ct. at 570. Consequently, a hearing will no better determine the relevant facts (whether an appointed county employee filed for candidacy for elective office), than a simple review of the recorded papers by the board of commissioners.

Reversed and remanded for reinstatement of judgment for Itasca County.